[Civ. No. 17140. First Dist., Div. One. Feb. 18, 1958.]

JOSEPH T. MORENO, Appellant, v. RAY C. HAWBAKER, Respondent.

Lange & Rockwell for Appellant.

Berry, Davis & Channell for Respondent.

PETERS, P. J. — Joseph T. Moreno brought an action against Ray C. Hawbaker and his wife Dorothy for injuries received when the motorcycle he was riding collided with the automobile of defendants. The action was subsequently dismissed as to Dorothy Hawbaker. The jury brought in a verdict in favor of Ray C. Hawbaker. Moreno appeals from the judgment entered on that verdict.

The accident occurred on October 31, 1954, at about 8 p. m. on the Dam Road in the town of San Pablo, near where that road is intersected by Key Boulevard. Dam Road, at the scene of the accident, runs generally from north to south, while Key Boulevard runs generally in a northwesterly-southeasterly direction, intersecting Dam Road but not crossing it. The two streets intersect at about a 45-degree angle, so that

one coming from the north and turning into Key Boulevard would only be required to make about a 45-degree turn to his left.

At the time of the accident Hawbaker, with his wife and child in the car, was proceeding southbound on Dam Road. He intended to make a left turn into Key Boulevard. Two motorcycles, one driven by Edward Hemlab and the other by Moreno, were proceeding northerly on Dam Road. Near or in the intersection a collision between the two motorcycles and the automobile occurred. Hemlab was killed and Moreno seriously injured.

Hawbaker testified that, prior to the accident, he was driving about 30 miles per hour, but that, as he approached the Key Boulevard intersection and about 150 feet therefrom, he slowed down to 10 to 15 miles per hour, because he intended to make a left turn into Key Boulevard. He was on his right side of the road. He was looking ahead but saw no head-lights. He did not see Hemlab's motorcycle until he was but 5 to 10 feet from it. He saw a flash of light which he assumed was the reflection of his headlights, which were on, in the glass of the lights of Hemlab's motorcycle, which were not lit. He did not see Moreno's motorcycle at all before the impact. Hemlab's motorcycle was 3½ to 4 feet over the center white line on Dam Road on the wrong side of the road. It was respondent's story that Hemlab's motorcycle hit his automobile before he started to turn and while he was on the right side of the road for southbound traffic; that when Hemlab's motorcycle hit his car it turned the steering wheel causing the automobile to swerve to his left so that when Moreno's motorcycle came along respondent was on the wrong side of the road for southbound traffic. The pictures and the other evidence show that all the damage to Hawbaker's car was to its right side, particularly to the right front and rear doors. The automobile was not damaged in front.

Hawbaker, as already pointed out, testified that neither motorcycle had its lights on before or after the accident. Mrs. Hawbaker testified that the accident happened before her husband started to turn to the left.

Moreno testified that prior to the accident his maximum speed was 25 miles per hour and that he was driving on his right side of the road. He claimed that his lights were on, but admitted that the headlight was on low beam because the high beam did not function without flickering off and on.

Hemlab also had his lights on. Just as Hemlab entered the intersection Hawbaker turned to enter Key Boulevard. Both Moreno and Hemlab were on their right side of the road when they ran into the Hawbaker car.

The scene of the accident was described by the chief of police of San Pablo. He testified there was a stop sign on the northeast corner of Key Boulevard where it runs into the Dam Road, a marked crosswalk on Dam Road and a broken white line down the middle of Dam Road. Northerly of the intersection there was a street light. There were no houses near the intersection. The two streets intersect at about a 45-degree angle.

Tony Dykes, a high school student who was a neighbor of the Hawbakers, testified that with two companions he was in a lot about a half block from the intersection when he saw and heard the two motorcycles go by at between 40 and 60 miles per hour. Neither motorcycle had its lights lit. He exclaimed to his companions: "Look at those fools go," and then heard the crash but did not see it. Dykes' two companions corroborated him in all substantial details.

Subsequent to the accident Hawbaker was convicted of manslaughter, based on the death of Hemlab.

Appellant does not challenge the sufficiency of the evidence to sustain the judgment. He could not properly do so. Regardless of what the record may show as to Hawbaker's negligence, there is substantial and convincing evidence that Moreno was guilty of contributory negligence. There is evidence that he was driving his motorcycle after dark, without lights, at a speed estimated up to 60 miles per hour. That, of course, could constitute contributory negligence.

Appellant's main attack is on the instructions, contending some proposed by him and refused should have been given, and that others given were either incomplete or incorrect. His first major point is that the following five instructions proposed by him should have been given by the trial court. They all relate to the law applicable to turning movements at or before reaching an intersection. The challenged five instructions are:

*Proposed Instruction Number 5:* "As applicable to this case the intersection of Key Boulevard and Dam Road is the area embraced within the prolongation of the lateral boundary lines of the roadways."

*Proposed Instruction Number 6:* "Section 540 of the Ve-

hicle Code insofar as it applies to this action provides as follows:

" 'Required Position and Method of Turning at Intersection. The driver of a vehicle intending to turn at an intersection shall do as follows:

" '(b) Approach for a left turn shall be made in that portion of the right half of the roadway nearest the center line thereof and after entering the intersection the left turn shall be made so as to leave the intersection to the right of the center line of the roadway.' "

*Proposed Instruction Number 7:* "Vehicle Code Section 541(b) as applicable in this case provides as follows:

" 'No vehicle in a residence district shall be turned left across the roadway . . . when any other vehicle is approaching from either direction within 200 feet, except at an intersection.'

"A violation of this section constitutes negligence as a matter of law."

*Proposed Instruction Number 8:* "The driver of a vehicle proceeding in the proper lane in a given direction is not required to anticipate that another vehicle would suddenly cross into his lane of traffic."

*Proposed Instruction Number 10:* "If you find from the evidence that the defendant, Ray C. Hawbaker, was cutting the corner of the intersection at the time of the collision with the motorcycle of Joseph Moreno, the defendant, Ray C. Hawbaker, would be guilty of negligence as a matter of law."

There was no error in refusing to give these instructions.

■ Number 5 purports to define the term "intersection." The court gave the following instruction:

"Section 86 of the Vehicle Code of the State of California in effect at the time of this accident provides as follows:

" 'Intersection is the area embraced within the prolongation of the lateral curb lines, or, if none, then the lateral boundary lines of the roadways, of two highways which join one another at approximately right angles or the area within which vehicles traveling upon different highways joining at any other angle may come in conflict.' "

This instruction adequately covered the subject matter of proposed Instruction Number 5. There was, therefore, no error in refusing the proposed instruction.

■ The same can be said as to proposed Instruction Number 6. That instruction is merely a reworded version of the provisions of section 540, subdivision (b) of the Vehicle

Code. That section, as it read at the time of the accident, was contained, verbatim, in one of the given instructions.

■ Proposed Instruction Number 7 requested the giving of the provisions of section 541, subdivision (b) of the Vehicle Code. That section expressly refers to the law applicable when left turns are made "in a residence district." The burden was on plaintiff to show that this was such a district. There was no evidence at all that the accident occurred in a residence district. Indeed, in his opening brief appellant states that at the time of the accident all of the houses on the Dam Road for one block north and south of Key Boulevard had been removed in anticipation of a highway project. (App. Op. Brief p. 5.) In the absence of any showing by appellant that the area had been designated as a residence district, the trial court properly refused to give the instruction.

Appellant cites *Ades* v. *Brush,* 66 Cal.App.2d 436 [152 P.2d 519], in support of his contention that proposed Instruction Number 8 should have been given. In the Ades case the defendant cut across from the right lane of traffic across the center lane and hit the plaintiff, who was driving carefully in the extreme left lane. As to this situation this court stated (*Ades* v. *Brush,* 66 Cal.App.2d 436, 443 [152 P.2d 519]): "Mrs. George was certainly not required to anticipate that, while she was moving along in the extreme left lane of traffic, an automobile would cross those lanes at approximately a right angle and run into the right front of her car."

■ The rule stated in proposed Instruction Number 8 is a correct rule of law. But, as the Ades case clearly points out, that rule is only applicable where the driver is in his own lane, *and is driving carefully*. In the instant case there was substantial evidence that appellant was not driving carefully, that is, that he was driving very fast after dark without lights. The proposed instruction was incomplete and misleading. It would have told the jury that if appellant was in the proper lane, he did not have to anticipate that another driver would cross into that lane. The proposed instruction completely failed to state that for the proposed rule to apply the person claiming its benefit must himself be driving carefully. The instruction was properly refused.

■ Proposed Instruction Number 10 refers to the law applicable when a driver cuts the corner at an intersection. The proposed instruction states a correct rule of law. (*Bushey* v. *Union Oil Co.,* 13 Cal.App.2d 350 [56 P.2d 1272].) But this subject matter was adequately covered by other instruc-

tions. Sections 86, 551, subdivision (a), and 540, subdivision (b), were read to the jury. The jury was adequately instructed on the effect of left turns at an intersection. Thus, the refusal to give this instruction did not prejudice appellant's rights.

The second major contention of appellant is that the trial court improperly failed to indicate to the jury the location of the intersection, and particularly failed to indicate the points at which a proper left turn should have been made. In this respect he contends that section 86 of the Vehicle Code, which was read to the jury and which purports to define the term "intersection" is incomprehensible when applied to an odd angled intersection with shoulders but no curbs on the intersecting streets, and where one street curves into the other. This error was aggravated, so it is contended, when one of the jurors asked the court the following question and the following answer was given:

"A Juror: I'd like to know on the extension of the parallel lines of the edge of the highway. If the highway has a curve at the end of it, where do you continue on? You can't——

"The Court: You mean the prolongation of the highway?

"A Juror: Right.

"The Court: I don't have the map here to illustrate. But Counsel, I take it here that the prolongation is well-defined on the map, is it not?

"Mr. Lange: I would say so, Your Honor. The map is to scale.

"The Court: The map is there.

"Mr. Lange: That's correct.

"The Court: And prolongation means just extending the lines out across the other highway.

"A Juror: But you have to take the straight lines, right?

"The Court: The curved lines, you mean.

"A Juror: Yes."

As already pointed out, Key Boulevard intersects Dam Road at about a 45-degree angle and the street has no curbs. The diagrams, the pictures and the evidence show that the line of intersection is not straight but is curved, the curve on the north side being gradual, and that on the south abrupt.

Section 86 of the Vehicle Code gives the statutory definition of an intersection. It provides that it "is the area embraced within the prolongation of the lateral curb lines, or, if none, then the lateral boundary lines of the roadways, of two highways which join one another at approximately right angles

or the area within which vehicles traveling upon different highways joining at any other angle may come in conflict.'' There were several excellent photographs of the area introduced into evidence. There were also diagrams of the area introduced into evidence. The witnesses fully described the area. These photographs, diagrams and the oral testimony adequately told the jury about the physical situation. Obviously, the two highways do not join at right angles so that the provision of section 86 that is applicable is the one reading ''the area within which vehicles traveling upon different highways joining at any other angle may come in conflict.'' What the area of conflict is in other than right angle intersections depends upon the physical situation presented. This the jury knew from the photographs, diagrams and oral evidence. It was a fact question. The jury knew as much about this question as did the trial judge. They could tell where the possible area of conflict was located. Thus, the reading of section 86 of the Vehicle Code to the jury was all that was required.

It is true that when inquiry was made by a juror the trial judge was not too clear in his explanation. But he did refer to the maps. In view of the physical facts as disclosed by the photographs, diagrams and oral evidence, and in view of the fact that section 86 of the Vehicle Code was read to the jury, we do not think that the jury could have been misled by the judge's explanation.

■ Appellant next objects to certain rulings on the evidence. The court permitted interrogation of respondent as to his declining to testify at the coroner's inquest into the death of Hemlab, but sustained objections to questions seeking to bring out that respondent had refused to testify on the grounds of possible self-incrimination at the criminal trial, and had not testified at the preliminary hearing. The record shows that outside the presence of the jury counsel agreed to withdraw these questions, and then in the presence of the jury requested, and was granted, permission to withdraw the questions.

The rulings of the trial court were clearly correct. Section 755 of the Vehicle Code as it read prior to its repeal in 1957 (Stats. 1957, chap. 1956, p. 3497) provided: ''No record of the conviction of any person for any violation of this code, nor any testimony of or concerning or produced at the trial terminating in such conviction, shall be admissible as evidence in any court in any civil action.''

This section precluded any inquiry about the witness' refusal to testify at the criminal trial on the grounds of self-incrimination. It has been held that evidence that a person's refusal to testify at a coroner's inquest on the ground of self-incrimination is admissible ''for impeachment purposes since the claim of privilege gives rise to an inference bearing upon the credibility of his statement of lack of negligence upon his part.'' (*Nelson* v. *Southern Pac. Co.*, 8 Cal.2d 648, 654 [67 P.2d 682].) Such interrogation was permitted in the instant case. But section 755 prohibited similar interrogation of the witness at the trial of the criminal case.

It is equally clear that failure to testify at a preliminary examination should not be admissible for the reason that such failure cannot, logically, give rise to the adverse inference mentioned in the Nelson case. This is so because the accused does not, customarily, testify at the preliminary examination, so that his failure to do so is without legal significance.

In addition, as already pointed out, the record shows that the basic questions involved were voluntarily withdrawn by appellant.

The record shows that, at the coroner's inquest, the respondent's wife asked to be excused from testifying against her husband. In the present trial appellant sought to impeach her by offering into evidence a portion of the transcript at the coroner's inquest containing some highly critical remarks made by the coroner indicating that the witness was relying on self-incrimination. The trial court commented that the witness had the legal right to refuse to testify against her husband, and that the coroner's remarks about self-incrimination were incorrect and inflammatory. It sustained objections to this testimony. The ruling was obviously correct.

Appellant complains that it was error to refuse to admit into evidence certain photographs of the scene of the accident. The record shows that several excellent photographs of the scene of the accident were introduced, and that they clearly depicted the area involved. Other photographs were excluded because they did not add anything not already known to the jurors, or only showed bystanders, or were too gruesome. The ruling was well within the discretion of the trial court. (*Barone* v. *Jones*, 77 Cal.App.2d 656 [176 P.2d 392, 177 P.2d 30]; *Harmon* v. *San Joaquin L. & P. Corp.*,

37 Cal.App.2d 169 [98 P.2d 1064]; *Hayes* v. *Emerson,* 110 Cal.App. 470 [294 P. 765].)

 Appellant complains of several rulings made by the trial court during the examination of the witness Tony Dykes. First, appellant complains that he was unduly limited in his cross-examination of the witness. The record does not support this contention. It shows that appellant was given ample opportunity to question the witness and that on several occasions he acknowledged that he had no further questions. The record indicates that any difficulty that occurred in determining what questions were or were not proper was caused by appellant's counsel jumping back and forth from cross-examination to direct to cross and to recross-examination.

 Appellant also complains that the statement of Dykes when he saw the two motorcycles proceeding at a high rate of speed and without lights ''Look at those fools go'' was hearsay and inadmissible. The statement was admitted for the limited purpose of showing a spontaneous declaration. It was admissible for that purpose (*Lane* v. *Pacific Greyhound Lines,* 26 Cal.2d 575 [160 P.2d 21].)

 The last contention of appellant necessary to mention is his contention that the trial court erroneously excluded from consideration, on the motion for a new trial, the affidavit of the juror Dolin. The record shows that the verdict was 9 to 3 for the defendant, that the jury was polled, and that the juror Dolin twice answered ''yes'' when asked if the verdict as read was his. On the motion for a new trial he averred that at all times he had voted for plaintiff; that his ''yes'' when the jury was polled was made in the mistaken belief that he was confirming the tally of the jury which he had counted. He further avers that the jury first voted on the issue of contributory negligence, that he voted for plaintiff, and that the affiant counted the ballots and they were 9 to 3 in favor of defendant. But when the jury was polled in the courtroom his ''yes'' vote was necessary to make the vote 9 to 3.

Defendant moved to strike this affidavit and the affidavits of several other jurors to the effect that the juror Dolin had always favored a plaintiff's verdict. The trial court, in its order denying this motion, stated that it believed that this was an improper attempt to impeach the verdict. But nevertheless, the court *denied* the motion to strike. Subsequently, the trial court denied the motion for a new trial. The affidavits were necessarily before the court at that time. We

must assume that the trial court considered them, and found that the "yes" given in the courtroom correctly represented Dolin's then views, and so denied the motion for a new trial. (*Metcalfe* v. *Pacific Electric Ry. Co.*, 63 Cal.App. 331 [218 P. 486].) Thus, even if the affidavits were admissible under the exception to the impeachment rule stated in the Metcalfe case, *supra*,* the most they accomplished was to create a conflict with the record of what occurred when the jury was polled. This conflict was for the trial court to resolve. In view of the record, we must assume that it did so.

The judgment appealed from is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

---

*There is a serious question as to whether the affidavits were proper. (See *Fernandez* v. *Consolidated Fisheries, Inc.*, 117 Cal.App.2d 254 [255 P.2d 863]; *Clark* v. *Bradley*, 106 Cal.App.2d 537 [235 P.2d 439].)